NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

MAYES BROS., INCORPORATED, Respondent.

No. 23710.

United States Court of Appeals Fifth Circuit.

Aug. 22, 1967.

Marcel Mallet-Prevost, Asst. Gen. Counsel, N. L. R. B., Vivian A. Asplund, Atty., N. L. R. B., Washington, D. C.,

Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Allison W. Brown, Jr., Atty., N. L. R. B., for petitioner.

Richard A. Royds, Houston, Tex., for respondent.

Bracewell & Patterson, Houston, Tex., of counsel, for respondent.

Before RIVES, WISDOM, and GOLDBERG, Circuit Judges.

WISDOM, Circuit Judge:

The National Labor Relations Board seeks a decree enforcing its order of June 17, 1965,[1] against Mayes Brothers, Inc., a company engaged in the pipe coating and wrapping business in Houston, Texas. The Board found that Mayes Brothers (1) had violated §§ 8(a) (5) and (1) of the National Labor Relations Act[2] by failing to bargain in good faith with the International Chemical Workers Union, AFL–CIO, the certified representative of Mayes' employees, and (2) had

violated § 8(a) (1) by engaging in conduct which interfered with the employees in the exercise of their statutory rights. The two charges are closely related, as reflected in the record and in this opinion. We hold that substantial evidence supports the Board's findings and we enforce, but modify, the Board's order.

I.

The controversy centers around a bargaining session held June 3, 1964, and on the Company's conduct thereafter. The Board accepted the following version of the contract negotiations.

Before June 3, 1964, the parties were deadlocked on the scope of a management rights clause. They had agreed on all other contract provisions as early as September 1962. In the June 3 meeting Oliver Farr, the Union representative, broke the deadlock by agreeing to accept the management rights clause proposed by the Company. The Union concession was prompted by the Company's offer to grant a wage increase of 12 cents an hour in place of a 6 cent increase previously agreed upon. The parties also reopened the issue whether the contract term should be one or two years. Farr offered to accept whichever period the Company desired but conditioned acceptance of the two year term on an additional wage increase of 12 cents an hour in the second year.

At the conclusion of the June 3 meeting Farr asked Carlton Wilde, the Company attorney, to draft an agreement for the parties to sign. Wilde said he would need three or four days to study what had been discussed. Several days later Wilde informed Farr that he had not yet succeeded in getting H. Boyd Mayes, the Company president, to sign the agreement, but that he would continue to try. Farr telephoned Wilde numerous times thereafter to see if Mayes would sign the contract, but Wilde reported that Mayes had not signed.

At no time after the June 3 meeting did either party raise a question concerning

1. 153 NLRB 18.

2. As amended, 29 U.S.C.A. § 158(a) (5) and (1).

the substance of the agreement. During the last telephone conversation Wilde asked Farr if the Union would accept a letter contract rather than a formal agreement. Farr agreed to consider this proposal and Wilde agreed to draft a letter, present it to Mayes, and send Farr a copy. Wilde never sent the letter because Mayes refused to sign it.

■ On these facts the Trial Examiner concluded that on June 3, 1964, the parties had reached agreement on all the substantive terms of a collective-bargaining contract and that nothing further was required but the signature of the parties. Accordingly, he held that the Company's refusal to sign the contract constituted a per se violation of § 8(a) (5). H. J. Heinz Co. v. N. L. R. B., 1941, 311 U.S. 514, 61 S.Ct. 320, 85 L.Ed. 309; N. L. R. B. v. Berkley Mach. Works & Foundry Co., 4 Cir. 1951, 189 F.2d 904, 909–910; N. L. R. B. v. Todd Co., 2 Cir. 1949, 173 F.2d 705, cert. denied, 1950, 340 U.S. 864, 71 S.Ct. 87, 95 L.Ed. 631; Sears Roebuck & Co., 1962, 139 N.L.R.B. 471; James C. Ellis, 1953, 102 N.L.R.B. 497; 7 N.L.R.B. Ann.Rep. 49 (1942); see National Labor Relations Act § 8(d), as amended 29 U.S.C.A. § 158(d). The Board rejected the finding that the parties had agreed on all contract terms at the June 3 meeting, pointing out that technically the parties did not settle the issue of contract duration; the Company might have desired a two year contract but been unwilling to grant an additional wage increase in the second year. The Board thought the evidence nevertheless showed that the Company misled the Union into believing that the parties had reached complete agreement and that only execution of the contract remained. The Board relied on this inference, among others, to support its conclusion that the Company had not displayed the requisite good faith in bargaining.

■ We hold that substantial evidence on the record as a whole supports the Board's factual findings and the conclusion of bad faith it drew from them. See N. L. R. B. v. Walton Mfg. Co., 1962, 369 U.S. 404, 82 S.Ct. 853, 7 L.Ed.2d 829; Universal Camera Corp. v. N. L. R. B., 1951, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456; N. L. R. B. v. McGahey, 5 Cir. 1956, 233 F.2d 406; N. L. R. B. v. Poultry Enterprises, Inc., 5 Cir. 1953, 207 F.2d 522. The Company contends that it was evident to the Union that the parties had not reached an understanding, but this contention is largely rebutted by the fact that Wilde limited his conversations with Farr subsequent to June 3 to the mechanics of executing "the agreement." At no time did Wilde mention dissatisfaction with the choice the Union had given the Company concerning contract duration or with any other term of the agreement as a ground for Mayes' failure to sign the contract. Moreover the Trial Examiner found that implicit in Wilde's request that the Union accept a "letter contract" was an understanding that the substantive terms of an agreement were settled. He also thought Wilde's proposal implied that Company opposition to the form of a binding contract was impeding execution of the agreement, not dissatisfaction with the Union's position on any substantive contractual issue. Certainly Farr could reasonably conclude from his conversations with Wilde that the Company had acceded to one of the alternatives he had proposed concerning contract duration and all that remained to be done was to execute the contract. Farr's testimony supports the inference that he was so misled.[3]

3. Wilde denied speaking to Farr in terms of "the agreement" and claimed he proposed merely "the idea of a letter" rather than a letter with any particular substantive terms. The Board, however, resolved the conflict in the testimony against the Company. The Board's findings are not clearly unreasonable.

The Company contends that the parties never settled the scope of the management rights clause, so it was clear to the Union that the parties had not reached an understanding. Two management rights clauses were before the parties, the Company's original proposal and an amended proposal more favorable to the Union. The Union had previously rejected both of these proposals, and the Company argues that it was unclear which clause the Union accepted

The Board did not specify whether the Company deliberately misled Farr or whether, instead, its apparently misleading conduct simply reflected its president's desire not to contract with the Union. On either theory, the Company failed to satisfy its statutory obligation to bargain in good faith.

 The duty to bargain in good faith requires the parties to confer and negotiate in a genuine effort to reach an agreement if it is possible to do so. N. L. R. B. v. Montgomery Ward & Co., 9 Cir. 1943, 133 F.2d 676, 146 A.L.R. 1045; N. L. R. B. v. Reed & Prince Mfg. Co., 1 Cir. 1941, 118 F.2d 874, 885, cert. denied, 313 U.S. 595, 61 S.Ct. 1119, 85 L.Ed. 1549; N. L. R. B. v. Boss Mfg. Co., 7 Cir. 1941, 118 F.2d 187; Globe Cotton Mills v. N. L. R. B., 5 Cir 1939, 103 F.2d 91; see Cox, The Duty to Bargain in Good Faith, 71 Harv.L.Rev. 1401, 1412–18 (1958); Smith, The Evolution of the "Duty to Bargain" Concept in American Law, 39 Mich.L.Rev. 1065 (1941). The Company's failure to object to the choice the Union gave concerning contract duration is strong evidence that the Company considered one of the alternatives acceptable. Not until the Union filed an unfair labor practice charge, four months after the final bargaining session, did the Company mention the failure to settle the contract's duration as an excuse for its refusal to sign a contract.

 If the Union's offer concerning contract duration was in fact acceptable to the Company, a fair inference, it was proper for the Board to conclude that the Company was guilty of bad faith in refusing to execute the contract. A technical deficiency in the agreement is no defense if a desire not to contract with the Union in fact motivated the Company's refusal. See Lozano Enterprises v. N. L. R. B., 9 Cir. 1964, 327 F.2d 814; Tulsa Sheet Metal Works, Inc., 1964, 149 N.L.R.B. 1487, enforcement granted, 10 Cir. 1966, 367 F.2d 55; Ariel Offset Co., 1964, 149 N.L.R.B. 1145. If, on the other hand, the Union proposal was not acceptable to the Company, the Company was under a duty so to inform the Union. Its failure either to sign the agreement or to advise the Union why it would not sign is inconsistent with any sincere intention to compose differences without unnecessary delay and therefore is not good faith bargaining. See N. L. R. B. v. National Shoes, Inc., 2 Cir. 1953, 208 F.2d 688; Artistic Embroidery, Inc., 1963, 142 N.L.R.B. 974, 982; Stanislaus Implement & Hardware Co., 1952, 101 N.L.R.B. 394, enforcement granted, 9 Cir. 1955, 226 F.2d 377. If the Union position on unresolved contract terms prevented the Company from executing a contract with the Union, Wilde's conversations with Farr were obviously designed to forestall, and did forestall, a continuation of negotiations on the substance of a contract.

Wilde's conversations with Farr are not the only evidence of the Company's intention not to reach agreement with the Union. The Examiner found, from uncontradicted testimony, that after the Union capitulated on the management rights

at the June 3 meeting. The Union contends, and the Trial Examiner found, that the Union unambiguously accepted the management rights clause first proposed by the Company.

The Company points to a conflict in the testimony of two Union witnesses concerning the Union's acceptance of this proposal. The witness who testified that the Union had accepted the amended management rights clause corrected his testimony, however, after he had examined the originl clause. His initial confusion is not surprising since the first bargaining session he attended was the one on June 3; Farr, who had followed the course of negotiations from the be-

ginning, consistently testified that the Union had accepted the original management rights clause.

Although the evidence was contradictory, the Trial Examiner was justified in finding that the Union had unambiguously accepted the management rights clause orginally submitted by the Company. Neither at the June 3 meeting nor during the telephone negotiations that followed did the Company communicate to the Union any doubt about which management rights clause the Union had accepted. If the Company was concerned about which clause the Union had accepted, it would have been a simple matter to ask.

clause President Mayes declared he would rather give a 25 cents an hour wage increase than sign a contract with the Union. Wilde himself testified that the Company asked the Union representatives why they were so persistent in their attempts to secure a contract and pointed out that the Union had given up at other plants.

Moreover the Examiner found that subsequent to June 3 the Company engaged in a program of Interference with the object of dissipating the Union's majority, in violation of § 8(a) (1). John Dyess, a supervisor, told various employees he would guarantee a substantial wage increase if the employees would vote out the Union. Dyess also warned that the employees would receive no wage increase unless they rejected the Union because Mayes would never sign a contract with the Union. Mayes himself told an employee, "You possibly will get along much better out here by staying with me and let that Union alone." Although Dyess denied some of the statements attributed to him, the Trial Examiner and the Board did not credit his denials. The testimony of several employees supports these findings.

The Company's interference violates § 8(a) (1) although the Company did not succeed in deterring the employees from union activity. N. L. R. B. v. Brown-Dunkin Co., 10 Cir., 1961, 287 F.2d 17; N. L. R. B. v. Hill & Hill Truck Line, Inc., 5 Cir. 1959, 266 F.2d 883; Elastic Stop Nut Corp. v. N. L. R. B., 8 Cir. 1944, 142 F.2d 371, cert. denied, 323 U.S. 722, 65 S. Ct. 55, 89 L.Ed. 580. That the Company used the time it gained by delaying contract negotiations to prevail upon the employees to abandon the Union also supports the conclusion that during negotiations the Company intended to avoid entering a contract with the Union in violation of § 8(a) (5). See Great Southern Trucking Co. v. N. L. R. B., 4 Cir. 1942, 127 F.2d 180, cert. denied, 317 U.S. 652, 63 S.Ct. 48, 87 L.Ed. 524; cf. N. L. R. B. v. Idaho Egg Producers, Inc., 9 Cir. 1956, 229 F.2d 821; N. L. R. B. v. Whelling Pipe Line, Inc., 8 Cir. 1956, 229 F.2d 391;

Joy Silk Mills, Inc. v. N. L. R. B., 1950, 87 U.S.App.D.C. 360, 185 F.2d 732, cert. denied, 1951, 341 U.S. 914, 71 S.Ct. 734, 95 L.Ed. 1350; N. L. R. B. v. Booker, 5 Cir. 1950, 180 F.2d 727, 730; N. L. R. B v. Dixie Motor Coach Corp., 5 Cir. 1942, 128 F.2d 201.

## II.

The Company argues that the Board violated fundamental concepts of justice by basing its decision on the ground that the Company had misled the Union into believing that it considered the contract terms settled. The Company contends that since the Trial Examiner and General Counsel relied instead on the theory that the parties had actually reached complete agreement, the Board's theory is "gratuitous" and should not be enforced. We cannot agree. The dominant issue here is whether the Company failed to bargain in good faith with the Union. The Board is not bound by the Examiner's erroneous legal conclusion that the parties had reached complete agreement. The Board's conclusion that the Company misled the Union is a fair inference drawn from the findings.

The complaint alleged not only that the Company refused to execute a contract embodying the parties' complete understanding, but also that the Company "negotiated with the Union in bad faith and with no intention of entering into any final or binding collective bargaining agreement." The complaint thereby brought into question the general course of the Company's conduct as it reflected its attitude toward bargaining. The N. L. R. B. v. Cascade Employers Ass'n, 9 Cir. 1961, 296 F.2d 42; N. L. R. B. v. Reed & Prince Mfg. Co., 1 Cir. 1953, 205 F.2d 131, cert. denied, 346 U.S. 887, 74 S.Ct. 139, 98 L.Ed. 391. The parties thoroughly litigated the issue of overall good faith at the same time that they disputed whether the contract terms were settled; the Trial Examiner made findings bearing upon both issues. The Board accepted all the Examiner's findings except his conclusion that the parties resolved the issue of contract duration on June 3. It was readily predictable that if

the Company succeeded in its contention that the parties did not reach complete agreement, the findings concerning the substance of Wilde's conversations with Farr would nevertheless support an inference of actual bad faith.

### III.

The Company also objects that the Board's order is too broad. The order requires the Company to cease and desist from refusing to bargain with the Union, soliciting withdrawals from the Union, informing employees that it will not enter a contract with the Union, and "in any manner interfering with, restraining or coercing employees in the exercise of rights guaranteed by Section 7 of the Act." It also requires the Company to bargain collectively with the Union and "if an understanding is reached, embody such understanding in a signed agreement." The Company must post notices at its plant informing employees that the Company will not, among other things, attempt to get the employees to withdraw from the Union "or any other labor organization." The Company objects to the quoted phrases.

■ In view of the circumstances of this case we think that the portion of the Board's order restraining the Company from interfering "in any manner" with employees' § 7 rights should be revised to prohibit only interference "in any like or related manner." N. L. R. B. v. Southwire Co., 5 Cir. 1965, 352 F.2d 346; Southwire Co. v. N. L. R. B., 5 Cir. August 2, 1967, 383 F.2d 235. Although the Company violated § 8(a) (1), we do not think that the Company's conduct shows such an attitude of opposition to the purposes of the Act as would justify an order restraining all possible future violations of the Act. See N. L. R. B. v. Moore Dry Kiln Co., 5 Cir. 1963, 320 F.2d 30; N. L. R. B. v. Federal Engineering Co., 6 Cir. 1946, 155 F.2d 17. On the other hand, the order need not be limited to restraining the precise means of interference practiced in the present case. Interference with employee rights can take many forms, and the Board could reasonably have found "the threat of continuing and varying efforts to attain the same end in the future." N. L. R. B. v. Express Publishing Co., 1941, 312 U.S. 426, 438, 61 S.Ct. 693, 700, 85 L.Ed. 930. An order restraining Company interference "in any like or related manner" with employees' organizational rights will protect the Company from the possibility of contempt proceedings if in the future it commits some new violation unlike and unrelated to the violation now found. See N. L. R. B. v. Great Atlantic & Pacific Tea Co., 5 Cir. 1960, 277 F.2d 759. At the same time it will adequately remedy the independent § 8(a) (1) violation involved in the present proceeding.

■ The provision that the Company embody in a signed agreement any understanding that is reached with the Union should be amended by adding "at the Union's request." Section 8(d) of the amended Act requires "the execution of a written contract incorporating any agreement reached" only "if requested by either party * * *" 29 U.S.C.A. § 158 (d); Midland Broadcasting Co., 1951, 93 N.L.R.B. 455. The Board's order should not require more of the Company than is required by the National Labor Relations Act. See N. L. R. B. v. Laney & Duke Storage Warehouse Co., 5 Cir. 1966, 369 F.2d 859, 869.

■ Finally, we hold that the notice goes too far in committing the Company not to attempt to get employees to withdraw from "any other labor organization." Since there is nothing in the record to indicate that the Company has engaged in or is likely to engage in unfair labor practices with any other union, the notice should be amended by deleting the phrase "or any other labor organization." See Communications Workers of America v. N. L. R. B., 1960, 362 U.S. 479, 80 S. Ct. 838, 4 L.Ed.2d 896; N. L. R. B. v. Scherer & Sons, Inc., 5 Cir. 1966, 370 F. 2d 12; N. L. R. B. v. Laney & Duke Storage Warehouse Co., 5 Cir. 1966, 369 F.2d 859; N. L. R. B. v. Atlanta Coca-Cola Bottling Co., 5 Cir. 1961, 293 F.2d 300, 310; N. L. R. B. v. United States Steel Corp., 3 Cir. 1960, 278 F.2d 896, cert.

denied, 1961, 366 U.S. 908, 81 S.Ct. 1083, 6 L.Ed.2d 234, 366 U.S. 909, 81 S.Ct. 1084, 6 L.Ed.2d 234; N. L. R. B. v. Ford Motor Co., 5 Cir. 1941, 119 F.2d 326. But see Marshfield Steel Co. v. N. L. R. B., 8 Cir. 1963, 324 F.2d 333.

As so modified, the Board's order is enforced.