**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**INDUSTRIAL WIRE PRODUCTS CORPORATION, Respondent.**

No. 71–1140.

United States Court of Appeals, Ninth Circuit.

Feb. 7, 1972.

Ira Goldberg (argued), Elliott Moore, Attys., Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcell Mallet-Prevost, Asst. Gen. Counsel, N.L.R.B., Washington D.

C., Ralph E. Kennedy, Director, Region 21, N.L.R.B., Los Angeles, Cal., for petitioner.

Orville L. Marlett (argued), Santa Ana, Cal., for respondent.

Before TRASK and CHOY, Circuit Judges, and BYRNE,* District Judge.

WILLIAM M. BYRNE, Senior District Judge:

Charging that it "was pointless to continue arriving at agreements [which] the company [Industrial Wire Products Corporation] would not sign," the Union[1] discontinued further participation in collective bargaining negotiations which had spanned a period of some seven months. The Union's consternation was vented upon the National Labor Relations Board (the Board) which found that during the course of the protracted negotiations the Company had violated Section 8(a) (5) and (1) of the National Labor Relations Act (the Act), 29 U.S.C. § 158(a) (5) and (1), by refusing to bargain in good faith with the Union and by refusing to execute a written contract incorporating an agreement reached with the Union. Pursuant to Section 10(e) of the Act, 29 U.S.C. § 160(e), the Board has petitioned for enforcement of its order directing the Company, at the Union's request, to execute a contract which embodies the substantive provisions of an agreement reached on June 19, 1968 (see below), or failing that, to bargain in good faith for a new agreement.

Following the Union's election and certification as the bargaining representative of "an appropriate unit" of the Company's employees,[2] representatives of management and labor[3] on January 26, 1968,[4] initiated collective bargaining negotiations. At this introductory meeting, attorney Marlett made it clear to all present that the ultimate responsibility for the Company's approval or rejection of any forthcoming agreement rested with sole shareholder Potter.

At the second meeting, held on January 30 and attended by the same representatives, the Union advanced a written proposal which called for a union shop and dues checkoff. Although the proposal was not specific as to wages and duration, Chaplin stated it had been presented as a one year term.

The Union renewed its proposed agreement to the same team of management representatives at the outset of the third meeting held on February 28. Alfred Smith who had replaced Chaplin as one of the Union's negotiators testified, and the Trial Examiner found, that while Marlett stated the clause providing for a union shop was unacceptable, he did indicate that a possible agreement on some form of maintenance of membership could be negotiated. Similarly, Rogel's contention that the proposed check off clause would prove too burdensome for the payroll department was largely placated by the Union's suggestion that it compile the necessary data and submit same to the Company. Rogel indicated that this suggestion as well as the plan which called for a checkoff only once a month were likely to meet with acceptance.

Smith reiterated the position taken at the previous meeting that the proposed

* Honorable William M. Byrne, Senior United States District Court Judge, Central District of California, sitting by designation.

1. United Electrical, Radio and Machine Workers of America, Local 1421.

2. The unit which the Board found to be appropriate for the purpose of collective bargaining within the meaning of Section 9(a) and (b) of the Act, 29 U.S.C. § 159(a) and (b), included the following groups of employees: all production,

maintenance, shipping and receiving employees as well as truck drivers.

3. At the first collective bargaining session, the Company was represented by E. R. Potter, its president and sole owner, Joseph Rogel, its secretary-treasurer, and Orville Marlett, its attorney; the Union was represented by Humberto Camacho and Patrick Chaplin.

4. All of the events in controversy occurred in 1968.

contract was for a one year term. As the meeting adjourned, Smith's promise to trim the length of the proposal as well as to simplify its terms was favorably received by both sides.

After the Union had presented its promised abbreviated proposals, Marlett repeated the Company's opposition to a union shop. Nevertheless, he agreed that some form of maintenance of membership was desirable and that the Company would draft proposals to that end. In response to Rogel's renewed claim that the checkoff clause constituted an inconvenience, the Union again voiced its willingness to assemble the necessary information for the Company and to require only one collection a month by the Company. Marlett manifested his approval of the Union's flexibility by agreeing to draft a proposal calling for but one collection per month.

At the March 14 meeting, Potter authorized Marlett to meet with Smith and complete the technical language. Marlett drafted an agreement in advance of the meeting with Smith and Camacho which was held in his office on March 20 or 21. The two union representatives denounced as "inconsistent" with previous negotiations, Marlett's proposed provisos requiring Company recognition of the Union only if 100 percent membership in a bargaining unit had been obtained and making it mandatory for only new employees to become union members. The three negotiators then agreed the "new employees" obligated to join the Union were those persons hired after January 25, the date of the Union's certification. Following the Union's acceptance of the language providing for collection of dues once a month, Marlett agreed to present a full contract as well as a wage proposal at the next meeting.

On April 8, the two sides met again, this time at full negotiating strength. Marlett produced a document entitled "AGREEMENT," which included the language requiring 100 percent union membership as a condition precedent to Company recognition. Acting upon the Union's objection thereto, Marlett agreed to delete this proviso. Thereafter, Smith proposed that the "Agreement," which included the same checkoff clause as the one previously propounded by Marlett, as well as the definition of "new employees" orally agreed to at the March 20 meeting, be put into effect and that the wage issue (the Union had rejected the Company's wage proposal) be resolved at a later date. Smith's proposal was rejected by the Company.

Ten days later, April 18, the negotiations resumed, with only Camacho representing the Union. Following his acceptance of a new wage proposal proffered by the Company, Camacho declared that he "was not going to renegotiate something which we were already in agreement on." This declaration was in response to questions about union security and dues checkoff raised by Rogel. At this meeting, Marlett raised the possibility of a three year agreement, to which Camacho retorted that such a term was conceivable if the Company agreed to a full union shop.

Upon being advised by Camacho of the Company's seemingly changed attitude, Smith telephoned Marlett who acknowledged the Company "had backed away" from its earlier agreement relating to union security and dues checkoff. Smith responded by accusing the Company of attempting to renege on its commitments.

The parties returned to the negotiating table on May 7, each fielding a different lineup: Chaplin and Camacho represented the Union, while Marlett and Rogel appeared on behalf of the Company. Potter did not attend this or any subsequent meeting.[5] Anxious to reach a final accord, Chaplin went

5. Although the meeting of April 18 was the last one Potter attended, he was kept personally informed by Marlett and Rogel as to what had transpired at each subsequent meeting. Additionally, as noted by the Trial Examiner, "He was also fully aware of the content of the various agreements presented by the parties and ultimately agreed to in negotiations."

through the Company's offer of April 8 and offered to accept a three-year contract if it included provisos for wage re-openings in the second and third year of the contract. All agreed new employees would become members of the Union but that union membership was strictly an optional matter for those presently in the employ of the Company. It was further agreed that the Union would provide the Company with a monthly list of its members and that the Company would make one monthly dues deduction.

Pursuant to an understanding that he do so, Chaplin prepared and forwarded to Marlett, with copies to Rogel and Potter, a contract which embodied the points specifically agreed to by both sides. On May 20, Marlett advised Chaplin that the union security and checkoff clauses were unacceptable to the Company.

Thereafter, the negotiations were conducted under the auspices of the Federal Mediation and Conciliation Service. Following two unproductive meetings, the parties met on June 19 and signed (Marlett for the Company, Smith and Chaplin for the Union) a settlement stipulation which provided, *inter alia,* for a three-year contract term from the certification date; for a maintenance-of-membership system; and for the Union's entry upon the Company's premises once a month to collect dues. This stipulated settlement was subject to ratification by the Company's president and its employees.

Although Marlett had agreed to draft a contract which reflected the signed stipulation, he presented instead, at a meeting held on July 2, a document (entitled "SUGGESTED LANGUAGE FOR AN AGREEMENT (NOT A PROPOSAL)") which provided for an open shop, prohibited the Union from entering upon Company premises for the purpose of collecting dues, extended the contract term to five years and abolished the prior wage agreements. Exasperated by the Company's repeated hollow cries of

"contract," the Union saw no alternative but to take leave of further negotiations.

In an effort to ward off enforcement of the Board's order, the Company has taken umbrage with the finding that Section 8(a) (5) and (1) of the Act was violated as a result of its participation in the collective bargaining negotiations at issue. According to the Company, this finding is unsupported by "substantial evidence on the record." As the Company recollects these negotiations, it was the party which saw its good faith efforts go for naught: "The parties *never* arrived at an entire agreement, and (thus) without (such) an agreement, there (was) *no contract* to sign." Because we are free of the perception boggling phenomenon commonly known as self-interest, we have been able to see these negotiations in a light which more accurately reflects reality. In short, it is only by viewing these events through the rose-colored glasses worn by the Company that the stark clarity of the Board's finding becomes attenuated.

As indicated, the Company's assessment of these negotiations is couched in a naivete which seems to flaunt reality. For example, the Company maintains that the proposals which served as the bases of the lengthy bargaining sessions were not tendered as offers, but were propounded to enable the parties to discuss the language which could be incorporated into any agreement that might ultimately be reached. The nature of the proposals set forth and the reactions thereto by each side clearly indicates the parties perceived these sessions as more than linguistic seminars. As shown by our recount of the facts, the parties viewed these proposals as offers which were advanced for the purpose of garnering acceptances. This explains why Marlett's document entitled "Agreement" (a term, which in the context of these negotiations, could hardly be deemed ill chosen), which was presented at the April 8 meeting, received qualified acceptance by the Union. Indeed, it

is noteworthy that at the first meeting with the federal mediator, Marlett protested the Union's demands for more money by stating that "We have hammered this thing out for months, and I thought we had an agreement on this." In view of this evidence, we must agree with the Trial Examiner and the Board that the Company's position is "contrary to the realities of collective bargaining and (thus is) unsupportable."

■■ Before turning to the precise challenge to the Board's finding, we consider a contention which is implicit in the Company's position. The Company maintains, in effect, that it did not violate Section 8(a) (5) and (1) of the Act because the parties failed to enter into a contractual agreement. In our view, this misconceives the purpose of the Act, for the dominant issue is not whether an agreement was reached, but whether the parties negotiated in good faith. See, e. g., NLRB v. Mayes Brothers, Inc., 383 F.2d 242 (5th Cir. 1967). This is the meaning of the well settled rule that the duty to bargain in good faith requires that the parties negotiate in a manner which lends itself to the possibility of reaching an accord. NLRB v. Wonder State Manufacturing Co., 344 F.2d 210 (8th Cir. 1965); NLRB v. Montgomery Ward & Co., 133 F.2d 676 (9th Cir. 1943); NLRB v. Reed & Prince Manufacturing Co., 118 F.2d 874 (1st Cir. 1941), cert. denied, 313 U.S. 595, 61 S. Ct. 1119, 85 L.Ed. 1549 (1941). Thus, it is not without significance that the Board found in agreement with the Trial Examiner that the Company had "bargained in bad faith with the Union in violation of Section 8(a) (5) and (1) of the Act." In short, even if we were to agree with the Company that no agreement had been entered into, this alone would not insulate it from being found to have violated Section 8(a) (5) and (1) of the Act. See, generally, NLRB v. Mayes Brothers, Inc., supra; NLRB v. Cascade Employers Association, 296 F.2d 42 (9th Cir. 1961).

■ Our analysis of both matters convinces us that the Board's finding should prevail *in toto*. Firstly, we are satisfied that the record is replete with evidence which clearly demonstrates the Company's unwillingness to negotiate in good faith. The pattern of the Company's breaking of agreements to specific proposals is too consistent to dismiss it, as the Company urges, as requests for "time to analyze and digest the various Union proposals and . . . to see the various Union proposals in context as a complete contract." At the March 14 meeting, Marlett, who acknowledged that the parties were close to contractual agreement, received Potter's authorization to draft the "technical" language and to meet thereafter with union representatives to agree to the language term by term. Marlett's draft contained two provisions (relating to union security and dues checkoff) which were clearly inconsistent with the parties' prior discussions. When these inconsistencies were pointed out, Marlett was agreeable to making the appropriate changes in a full contract he planned to present at the next meeting. This proposal, entitled "Agreement" again contained these provisos. Upon Marlett's assurance that the objectionable clauses would be deleted, the Union accepted this "Agreement." The Company rejected this acceptance, claiming it wanted to resolve the matter of wages first. At the next meeting, the Union orally accepted the Company's wage proposal; the Company responded by expressing dissatisfaction with the union security and dues checkoff portions of the agreement. On May 7, the parties reached agreement on all matters of substance and it was agreed that Chaplin would prepare a draft incorporating the agreement which had been reached. Chaplin's efforts proved to be in vain for on May 20, Marlett notified the Union that the union security and checkoff clauses were unacceptable to the Company. The Company's self proclaimed policy of "analysis and diges-

tion" culminated with its presentation to the Union of a document labeled "SUGGESTED LANGUAGE FOR AN AGREEMENT (NOT A PROPOSAL)", which in no manner resembled the stipulated agreement signed by Marlett only days before.

As revealed by a review of the events in controversy, it both "taxes *and* stretches" credulity to believe that the Company came "to the bargaining table with a fair and open mind and a sincere desire and purpose to conclude an agreement on mutually satisfactory terms." Shannon & Simpson Casket Co., 99 NLRB 430; enforced, NLRB v. Shannon, 208 F.2d 545 (9th Cir. 1953). Instead, the Company approached these negotiations bent on sabotaging any effort to reach an accord which reflected the inroads the Union had made with the employees. Abandoning the traditional bargaining practice of give and take, the Company sought to achieve its desired end by resorting to deception and lapses of candor. The blatancy of these tactics was such that the Trial Examiner and the Board were easily able to see through the screen of smoke fanned by the self-serving testimony of Company negotiators Rogel and Marlett to the effect that the impression an agreement had been reached was never conveyed to the Union. Given the nature of the evidence refuting this "self-serving testimony", we would be acting outside the scope of our authority were we to disturb the finding of the true trier of fact and make respectable that which has been discredited. NLRB v. Holly Bra of California, Inc., 405 F.2d 870 (9th Cir. 1969); Pittsburgh-Des Moines Steel Co. v. NLRB, 284 F.2d 74 (9th Cir. 1960). To act so improvidently would run against the grain of simple logic as well, for we are persuaded that the evidence clearly supports the Board's finding that the manner in which the Company participated in the negotiations at issue manifested an unwillingness to bargain in good faith. See, San Antonio Machine & Supply Corp. v. NLRB, 363 F.2d 633 (5th Cir. 1966); See also, NLRB v. International Furniture Co., 212 F.2d 431, 433 (5th Cir. 1954), where the court stated: "The respondent's (employer's) reversal of position, its withdrawal of previous agreements, and its insistence upon substituting terms that had once been discarded, are indicative of a lack of good faith."

■ Equally unconvincing is the Company's contention that the absence of ratification by its President and the Union's membership precludes the entrance into a binding agreement by the parties. In part,[6] the Company has placed unwarranted reliance upon the reservation made at the outset of the negotiations to the effect that President Potter's personal approval was a condition precedent to the Company agreeing to any collective bargaining accord. Prior to May 7, Potter had attended all but one negotiating session, that being the meeting where he authorized Marlett to draft a contract and initial those paragraphs which the Company and the Union were in agreement. Additionally, Potter empowered Marlett to enter into discussions concerning the unresolved matter of wages. At the meetings at-

---

6. The Company has also placed reliance on NLRB v. Newberry Equipment Co., 401 F.2d 604 (8th Cir. 1968), a case which we find readily distinguishable from the instant one. There, the agreement reached by the parties required approval by the Company's board of directors and the Union's membership as well as its international office. In refusing to sustain the Board's finding that the Company had violated Section 8(a) (5) and (1) of the Act, the court, speaking through Judge (now Justice) Blackmun, placed considerable emphasis on the fact the agreements were only "tentative." By contrast, here, as found by the Trial Examiner and the Board, the agreements were clearly more than provisional accords. Additionally, this controversy, unlike that in *Newberry*, was marred by violations of Section 8(a) (5) and (1) of the Act.

tended by Potter, the matters upon which the parties were most divided, i. e., the union security and checkoff clauses, were discussed *and* resolved.

Under these circumstances, we fully concur in the Trial Examiner's view that to sustain the Company's position is to commit "a travesty upon the right of ratification." We cannot raise to dignity the argument proffered by the Company because to do so would sanction the investiture of ostensible authority without any consequences resulting therefrom. See, United Steel Workers of America v. CCI Corporation, 395 F.2d 529 (10th Cir. 1968), cert. denied, 393 U.S. 1019 (1969). Neither can this court permit negotiators charged with the ultimate responsibility of approving or rejecting collective bargaining agreements to remain mute in the presence of a negotiated accord and to later let them catch their tongues at a moment they deem most likely to frustrate the progress that has been made. See, NLRB v. Mayes Brothers, Inc., 383 F.2d 242, 246 (5th Cir. 1967), where the court stated: "If, on the other hand, the Union proposal was not acceptable to the Company, the Company was under a duty so to inform the Union."

As noted by the dissenting member of the Board's panel, the stipulation of June 19 is fraught with concessions forced upon the Union by the Company's unfair labor practices. In short, the Union had reconciled itself to make the most of an ever deteriorating situation. Under these circumstances, the Union shall not be denied what gains it has eked out from this recalcitrant employer. Cf. Henry I. Siegel Co. v. NLRB, 340 F. 2d 309 (2d Cir. 1965); American Seating Company of Mississippi v. NLRB, 424 F.2d 106 (5th Cir. 1970).

The Board's petition for enforcement is granted.