[No. 63059-3. En Banc.]

Argued October 24, 1996.    Decided June 26, 1997.

PASCO POLICE OFFICERS' ASSOCIATION, *Petitioner*, v. THE CITY OF PASCO, ET AL., *Respondents*.

452

TALMADGE, J., concurs by separate opinion.

*Cline & Emmal,* by *James Cline,* for petitioner.

*Ogden Murphy Wallace, P.L.L.C.,* by *Gregory A. Rubstello,* for respondent City of Pasco.

*Christine O. Gregoire, Attorney General,* and *Spencer W. Daniels, Assistant,* for respondent Public Employment Relations Commission.

*James H. Webster* and *Lynn D. Weir* on behalf of Washington State Council of Firefighters, amicus curiae.

*Otto G. Klein III, Bruce L. Schroeder, Rodney B. Younker,* and *Kristin D. Anger* on behalf of the Association of Washington Cities, amicus curiae.

*Gene Godderis* on behalf of the Washington State Council of Police, amicus curiae.

SANDERS, J. — We here consider a dispute between a municipality and a union representing public employees.

The outcome turns on the proper application of the Washington Public Employees' Collective Bargaining Act (RCW 41.56).

The parties, a municipality and its police officers' association union representative, sought review of a decision of the Public Employment Relations Commission (PERC) which held (1) that the Association did not engage in bad faith bargaining when it reneged on an oral agreement during collective bargaining and (2) that the management rights proposal is a mandatory subject of bargaining that may be pursued to impasse. We hold that the Association did not engage in bad faith bargaining when it disavowed the oral agreement. We also hold that the management rights proposal is a mandatory subject of bargaining.

## FACTS

Employee Pasco Police Officers' Association (the Association), an independent union representing uniformed members of the Pasco Police Department, and employer City of Pasco (the City) were parties to a collective bargaining agreement that expired on January 1, 1993. The parties began negotiations for a successor agreement in summer 1992. This appeal concerns questions which arose during those negotiations.

### 1. Breach of Oral Agreement

During initial negotiations Victor Smedstad represented the Association. Negotiations between Smedstad and Pasco City Attorney Greg Rubstello took place in August and September 1992. A significant issue at these meetings was whether the parties would change the forum for appeal of disciplinary actions. The Association wished to allow employees the option of pursuing appeals of disciplinary actions to either the civil service commission, as was currently embodied in the agreement, or to grievance arbitration. After the meeting on September 22 Smedstad

informed Rubstello that the Association would "go with" civil service protections, i.e., retain the current language in the collective bargaining agreement. RP at 48, 113.

On October 1, 1992 Rubstello forwarded a written agreement memorializing the September 22 consensus to Smedstad. After hearing no reply, Rubstello finally called Smedstad's firm, which informed him that Smedstad had left the firm. Rubstello then spoke with James Cline of the same firm, who informed him he was the new chief negotiator for the Association.

When Cline and Rubstello finally met on November 10, 1992, Cline disavowed what Rubstello considered to have been the tentative agreement concerning the grievance procedure. The parties then filed a request for mediation with PERC. After two mediation sessions Rubstello requested the mediator declare an impasse and forward the open issues to the PERC executive director for certification of interest arbitration. The Association appealed to the examiner instead.

## 2. Management Rights Clause

The parties were also "at impasse" concerning another issue: management rights and hours of work. Specifically, the parties disagreed on the City's proposed management rights clause:

### ARTICLE III—MANAGEMENT RIGHTS

The union recognizes the exclusive right and prerogative of the city to make and implement decisions with respect to the operation and management of the police department. Provided, however, that the exercise of any and all of these rights shall not conflict with any provisions of this agreement. Such rights include, but are not limited to, the following:

1. To establish the qualifications for employment and to employ employees;

2. To establish the makeup of the police department's work force and make changes from time to time, includ-

ing the number and the kinds of classifications, and direct the city work force toward the organizational goals established by the city;

3. The right to determine the police department's mission, policies, and all standards of service offered to the public;

4. To plan, direct, schedule, control and determine the operation of services to be conducted by employees of the police department in the city;

5. To determine the means, method, and number of personnel needed to carry out the departmental operations and services;

6. To approve and schedule all vacations and other employee leaves;

7. To hire and assign or transfer employees within the department, or police related functions;

8. To lay off any employees from duty due to insufficient funds;

9. To introduce and use new or improved methods, equipment or facilities;

10. To assign work to, and schedule employees;

11. To take whatever action necessary to carry out the mission of the city in emergencies;

12. To determine the budget.

Any employee who may feel aggrieved by the unfair or discriminatory exercise of the management rights specified above, may seek his remedy by the grievance procedure provided by this agreement.

RP at 365 (PERC Consolidated Findings of Fact, Conclusions of Law & Order, April 26, 1994). Throughout negotiations between the City and the Association, the Association informed the City that it viewed the City's management rights proposal as an unlawful waiver of the Association's right to engage in collective bargaining and, as such, not a mandatory subject of bargaining which must

be withdrawn at impasse rather than submitted to interest arbitration.

On March 31, 1993, the Association filed a complaint under RCW 41.56.140(4), alleging the City committed an unfair labor practice by insisting on impasse on the proposed management rights and hours of work clauses. The City responded by filing both an answer denying the Association's allegations and its own unfair labor practice complaint against the Association pursuant to RCW 41.56.150(4). The City's complaint alleged the Association had reneged on what the City considered a tentative agreement concerning contractual grievance procedures.

The PERC hearing examiner consolidated the complaints regarding breach of the oral agreement and the management rights proposal. The examiner found the Association had bargained in bad faith by breaching an oral agreement regarding the grievance procedure and that bargaining the City's management rights and hours of work proposals was not an unfair labor practice.

The Association petitioned for review to PERC, which affirmed the examiner's conclusion on the management rights clause but reversed on the City's complaint regarding the Association's lack of good faith bargaining concerning the alleged breach of oral agreement. Each side then sought judicial review to the superior court, which certified the case to the Court of Appeals pursuant to RCW 34.05.518, which then transferred the matter to this court, asserting the case presented issues of broad public import qualifying for direct review pursuant to RAP 4.2(a).

## ISSUES PRESENTED

1. Are the management rights and hours of work proposals mandatory subjects of bargaining that may be pursued to impasse?

2. Did the Association commit an unfair labor practice

when it breached its oral promise to accept the existing grievance procedure?

## ANALYSIS

### STANDARD OF REVIEW

■■ Decisions of PERC in unfair labor practice cases are reviewable under the standards set forth in the Administrative Procedures Act. *City of Pasco v. PERC,* 119 Wn.2d 504, 506, 833 P.2d 381 (1992). RCW 34.05.570(3)(d) permits relief from an agency order if the agency erroneously interpreted or applied the law. *Pasco,* 119 Wn.2d at 507. Under the error of law standard, the court may substitute its interpretation of the law for that of PERC. *Public Sch. Employees v. PERC,* 77 Wn. App. 741, 745, 893 P.2d 1132, *review denied,* 127 Wn.2d 1019, 904 P.2d 300 (1995). *See also Pasco,* 119 Wn.2d at 507 ("[W]here an agency is charged with the administration and enforcement of a statute, the agency's interpretation of the statute is accorded great weight in determining legislative intent when a statute is ambiguous.") (citing *Cowiche Canyon Conservancy v. Bosley,* 118 Wn.2d 801, 828 P.2d 549 (1992)). The court may also grant relief from an agency order if it finds that the order "is not supported by evidence that is substantial when viewed in light of the whole record before the court . . . ." RCW 34.05.570(3)(e).

■■ This case concerns a dispute argued before PERC. "In contested cases, . . . [PERC] . . . considers, whenever possible, precedent established by the [National Labor Relations Board]." Jane R. Wilkinson, *Practice and Procedure Before the Washington State Public Employment Relations Commission,* 24 GONZ. L. REV. 213, 217-18 (1989). Washington courts follow this practice as well and consider decisions of the National Labor Relations Board (N.L.R.B.) construing the National Labor Relations Act (NLRA) persuasive but not controlling authority in interpreting state labor acts which are similar or based on the NLRA.

*Nucleonics Alliance v. Washington Pub. Power Supply Sys.*, 101 Wn.2d 24, 33, 677 P.2d 108 (1984); *Public Sch. Employees*, 77 Wn. App. at 745. When considering contradictory orders of PERC and the hearing examiner, Washington courts have followed the rule used by the federal courts that the standard of review remains the same even where the N.L.R.B. and the administrative law judge make contrary findings. *See International Ass'n of Firefighters, Local 469 v. PERC*, 38 Wn. App. 572, 576, 686 P.2d 1122 (1984). Thus, " '[t]he deference accorded fact findings runs in favor of the Board, but the administrative law judge's findings as part of the record must be weighed along with other opposing evidence, against the evidence supporting the Board's decision.' " *Id.* (quoting *N.L.R.B. v. Brooks Cameras, Inc.*, 691 F.2d 912, 915 (9th Cir. 1982)).

## MANAGEMENT RIGHTS CLAUSE

### 1. The Public Employee's Collective Bargaining Process

RCW 41.56.030(4) of the Washington Public Employees' Collective Bargaining Act defines collective bargaining:

> "Collective bargaining" means the performance of the mutual obligations of the public employer and the exclusive bargaining representative to meet at reasonable times, to confer and negotiate in good faith, and to execute a written agreement with respect to grievance procedures and collective negotiations on personnel matters, including *wages, hours and working conditions,* which may be peculiar to an appropriate bargaining unit of such public employer, except that by such obligation neither party shall be compelled to agree to a proposal or be required to make a concession unless otherwise provided in this chapter.

(Emphasis added.) In this process, "the parties come to the bargaining table as equals trying to resolve differences through a give and take process." Harry T. Edwards, *The Developing Labor Relations Law in the Public Sector*, 10 Duq. L. Rev. 357, 366 (1972). The Public Employees Col-

lective Bargaining Act (PECBA), RCW 41.56, like the NLRA, "regulates the subjective conduct and motivations of the parties in a collective bargaining situation, but expressly refrains from mandating any result or procedure for achieving final resolution of an intractable bargaining dispute." Stuart S. Mukamal, *Unilateral Employer Action Under Public Sector Binding Interest Arbitration*, 6 J.L. & COM. 107, 113-14 (1986) (discussing the NLRA). The resolution of disputes is left to the parties themselves, subject to intervention by PERC or the courts only when the conduct of a party indicates a refusal to bargain in good faith, which Mukamal has defined as "an absence of a sincere desire to reach agreement." *Id.* at 114. The mandate of the statute "extends only to the state of mind with which each party approaches the negotiating table and considers the proposals advanced by the other. While negotiating tactics designed to obstruct the bargaining process and/or to avoid conclusion of an agreement are proscribed steadfast, even stubborn disagreement in support of fixed positions on items in dispute has consistently been regarded . . . as permissible bargaining conduct so long as the basis and manner of disagreement do not conflict with the subjective duty to bargain in good faith." *Id.* at 114.

With regard to the topics about which the employer and the union representative bargain, issues that address "wages, hours and other terms and conditions of employment" are "mandatory" subjects about which the parties *must* bargain. *Klauder v. San Juan County Deputy Sheriffs' Guild*, 107 Wn.2d 338, 341, 728 P.2d 1044 (1986); *see also N.L.R.B. v. Wooster Div. of Borg-Warner*, 356 U.S. 342, 349, 78 S. Ct. 718, 722, 2 L. Ed. 2d 823 (1958) (examining NLRA). "On the other hand, the parties need not bargain on other matters which are referred to as permissive or nonmandatory issues including those that address the procedures by which wages, hours and the other terms and conditions of employment are established." *Klauder,* 107 Wn.2d at 341-42. Consequently, it is an unfair labor practice for a party to bargain to impasse over a nonman-

datory or permissive subject. *Id.*[1] An impasse is reached where, after a reasonable period of good faith negotiation, the parties have reached their final positions but remain at odds over one or more bargaining subjects. Washington State Council of County & City Employees, V WPERR (PECB Dec. 2167-A (Dec. 3, 1985)).

In the event of an impasse in negotiations with uniformed personnel, we have a "public policy in the state of Washington against strikes by uniformed personnel as a means of settling their labor disputes." RCW 41.56.430; *see also* Wilkinson, *supra* at 239 ("Unlike the NLRA, [the Washington statute] expressly state[s] that the right to strike is not granted."). Upon a declaration of impasse either the union or the employer may submit the dispute to PERC, which appoints a mediator. RCW 41.56.440. If, after a reasonable period of negotiations and mediation, the parties remain at impasse, then an interest arbitration panel is created to resolve the dispute.[2] RCW 41.56.450. During the pendency of the interest arbitration panel, existing wages, hours and other conditions of employment remain in effect. RCW 41.56.470. The decision of the arbitration panel is final and binding on the parties. RCW 41.56.480.

## 2. Waiver

The Association claims the management rights and hours of work proposals are "waivers" of its collective bargaining rights and, as such, are permissive, and not mandatory, subjects of bargaining which the City could

---

[1]In the private sector, the "NLRB has tended to construe the category of 'mandatory' subjects liberally. The result has been that when the parties face each other across a private sector bargaining table, they are in effect free to discuss virtually all matters which affect the employment relationship." Edwards, *supra* at 370.

[2]"Interest arbitration deals with the establishment of the relationship and agreements between the parties . . . . [It] is a methodology which parties may agree to use, absent a negotiated settlement, to determine what working conditions will be." *Klauder*, 107 Wn.2d 342.

not insist upon until impasse.[3] The hearing examiner implicitly agreed, but held that "an employer who has advanced a waiver clause . . . may impasse and seek interest arbitration on its proposal." RP at 386. PERC did not address the precise issue of whether this was a waiver but concluded "the management rights and hours of work clauses in this case [are] mandatory subjects of bargaining involving wages, hours and working conditions on which a party may insist to the point of impasse." RP at 431.

We turn first to the Association's contention that these proposals constituted waivers of their statutory collective bargaining rights.

█ Waivers "most often arise during the pendency of a collective bargaining agreement and focus on whether a union has given its assent (or waived objections) to unilateral employer action." *N.L.R.B. v. McClatchy Newspapers Inc.*, 964 F.2d 1153, 1157 (D.C. Cir. 1992) (Edwards, J., concurring). Courts will not "infer from a general contractual provision that the parties intended to waive a statutorily protected right unless the undertaking is 'explicitly stated.' More succinctly, the waiver must be clear and unmistakable." *Metropolitan Edison Co. v. N.L.R.B.*, 460 U.S. 693, 708, 103 S. Ct. 1467, 1477, 75 L. Ed. 2d 387 (1983). A waiver of bargaining rights must be knowingly made and must specifically address the subject upon which the waiver is claimed. V PERR, *Spokane County*, PECB Dec. 2167 at 18 (Dec. 3, 1985). "A waiver can be found by specific action, such as agreeing to particular contract language, . . . or by inaction, such as failing to raise timely objection to an act or proposal." *Id.* Courts will not infer a waiver "unless it is clear that the parties were aware of their rights and made the conscious choice, for whatever reason, to waive them." *N.L.R.B. v. New York Tel. Co.*, 930 F.2d 1009, 1011 (2d Cir. 1991).

The Association asserts a waiver is a voluntary action

[3]Neither party focuses much attention on the hours of work proposal, instead concentrating on the management rights clause.

which an arbitration panel or mediator cannot order. As such, it argues, waivers must be permissive subjects of bargaining because they are a subject a labor organization freely chooses to place on the table. The Association also urges us to find that waivers are merely procedures for bargaining, not a mandatory subject of bargaining.[4] The Association claims waivers of the right to collective bargaining are permissive subjects of bargaining because they are not themselves wages, hours, or conditions of employment.

We need not determine whether a waiver of collective bargaining rights is a mandatory or permissive subject of bargaining, however, because this is not a waiver case despite the fact that throughout all of its argument, the Association classified the management rights and hours of work clauses as "waivers." As noted above, waiver cases typically arise during the pendency of a collective bargaining agreement and concern whether a union has waived its objections *to unilateral employer action. McClatchy,* 964 F.2d at 1157 (Edwards, J., concurring). "Unions may choose to waive their statutory bargaining rights, and 'waiver' can be advanced as an *affirmative defense* to a 'unilateral change/refusal to bargain' unfair labor practice complaint." *City of Seattle*, XII WPERR (PECB Dec. 4162 at 27 (Sept. 24, 1992)), *adopted and aff'd by Public Employees Relations Comm'n* (PECB Dec. 4163-A (1993)) (emphasis added). Waivers are defenses used by *employers* to a charge that they have acted unilaterally without satisfying their obligation to bargain with the union. Waiver cases revolve around a claim by the employer that he does not have a duty to bargain with the union because the union has waived its bargaining rights on that issue.

However, in this case PERC concluded, as did the hearing examiner, the issue of waiver was not present. PERC was clearly correct in its analysis. The management rights

---

[4] This court has stated "the parties need not bargain on . . . [those] issues . . . that deal with the procedures by which wages, hours and the other terms and conditions of employment are established." *Klauder,* 107 Wn.2d at 341-42.

and hours of work proposals at issue here are not defenses to a union claim of unfair labor practice on the basis of the employer's unilateral action *under an existing contract.*

■ Under Washington law, a public sector employer cannot unilaterally impose the management rights or hours of work clauses on uniformed personnel: it may only insist on them until impasse, at which point they become the subject of interest arbitration. When an employer has insisted upon such clauses, it procedurally cannot defend itself by saying the union waived its rights on those subjects because the employer has, by insisting to impasse, already bargained with the union. This makes this case an "impasse" case and not a "waiver" case. Procedurally, the Association cannot claim in this case that the proposal waives its collective bargaining rights because it has already exercised these rights. The Association has fulfilled its statutory duties and rights to collectively bargain with the City by bargaining to impasse on the issue and then going to interest arbitration. "[P]arties subject to interest arbitration fulfill their respective obligations and responsibilities by preparing for interest arbitration." *City of Bellevue v. International Ass'n of Fire Fighters, Local 1604*, 119 Wn.2d 373, 384, 831 P.2d 738 (1992).

We therefore conclude that the management rights and hours of work proposals in this case did not waive the Association's statutory right to collectively bargain.

### 3. Impasse

We now turn to the issue of whether the City was justified in insisting to impasse on adoption of the management rights clause.

The City claims the Association's arguments on this issue run counter to persuasive federal cases directly on point holding that management rights proposals are

mandatory subjects of bargaining.[5] Unfortunately for the Association, federal case law on this subject is uniform, well settled and completely contrary to its position.

In *N.L.R.B. v. American Nat'l Ins. Co.*, 343 U.S. 395, 408-09, 72 S. Ct. 824, 832, 96 L. Ed. 2d 1027 (1952), the United States Supreme Court held "[w]hether a contract should contain a clause fixing standards for such matters as work scheduling or should provide for more flexible treatment of such matters is an issue for determination across the bargaining table, not by the [National Labor Relations] Board." *Id.* at 409. There the union had objected to a proposed management rights clause that would have given management " '[t]he right to select and hire, to promote to a better position, to discharge, demote or discipline for cause, and to maintain discipline and efficiency of employees and to determine the schedules of work . . . .' " *Id.* at 398 (quoting respondent's counter-proposal: "Functions and Prerogatives of Management"). Concluding that such contracts were not per se evidence of bad faith bargaining, the Court noted that "a review of typical contract clauses . . . shows that management functions clauses similar in essential detail to the clause proposed by respondent have been included in contracts negotiated by national unions with many employers." *Id.* at 405. The Court also noted that the matters covered by the management functions clause were " 'conditions of employment' which are appropriate subjects of collective bargaining . . . ." *Id.* at 407.

Because the United States Supreme Court's decision in *American National* predates the "mandatory/permissive" methodology it adopted in *Borg-Warner*, the Court did not specifically classify management rights clauses as mandatory in that case. However, subsequent federal courts have consistently held management rights clauses are mandatory subjects of bargaining. *See N.L.R.B. v. Salvation Army*, 763 F.2d 1, 7 (1st Cir. 1985) ("[I]t is true that a

---

[5] It appears both parties implicitly concede the hours of work proposal is a mandatory subject of bargaining because it deals with "hours."

management rights clause covering terms or conditions of employment is a mandatory subject . . . ."); *N.L.R.B. v. Tomco Communications, Inc.*, 567 F.2d 871, 878 (9th Cir. 1978) ("An employer may insist on a management rights clause to impasse without violating the [National Labor Relations] Act."); *Gulf States Mfrs., Inc. v. N.L.R.B.*, 579 F.2d 1298, 1318 (5th Cir. 1978) ("These substantive proposals of the Company on management rights were of no concern of the Board. The Company had the right to make them and could insist on them to impasse without violating the [NLRA].").

Management rights clauses, however, can go only so far. Under the NLRA, such clauses cannot invade a union's statutory right and duty to be the exclusive representative of the relevant employees. For example, in *Toledo Typographical Union No. 63 v. N.L.R.B.*, 907 F.2d 1220, 1222 (D.C. Cir. 1990) *cert. denied*, 498 U.S. 1053, 111 S. Ct. 767, 112 L. Ed. 2d 786 (1991) ("*Toledo Blade*"), the employer proposed a management rights clause that would have allowed it to directly address employees over retirement issues. The D.C. Circuit held that the proposed clause violated the NLRA and distinguished *American National* on the grounds that the clause in this case would have deprived the union of its statutory role as the employee's representative to the employer. *Id.* at 1223. The court noted that the clause at issue in *American National* would have ceded back to the employer "an area within which it could set the terms and conditions of employment notwithstanding the union's statutory right to bargain over those matters," *id.* at 1223, whereas the clause here "contemplates direct negotiations between employer and employee . . . ." *Id.* at 1224. The court concluded "[t]he clause does not, therefore, merely retain for the Employer unilateral authority to set certain terms and conditions of employment, as does a traditional management rights clause." *Id.*

The Association argues, however, that *Borg-Warner* modified the holding in *American National*, which did not

address waivers at all, and that federal precedent is inapplicable because of the differences between the NLRA and RCW 41.56. Under the NLRA, the employer is permitted to implement its last best offer, a power balanced by the union's right to strike, which is specifically forbidden for uniformed personnel in Washington. The fact that unions may resort to a strike, the Association contends, offsets the employer's right to insist on broad management rights language.

The statutory scheme in Washington contradicts the Association's claim that *American National* and its progeny are inapplicable in this State. First, while the Association is correct that uniformed employees do not have the right to strike, it ignores the requirement that public employers are obligated to negotiate in good faith. RCW 41.56.030(4). This obligation insures that management rights proposals do not overreach and are enforceable under the statute.

Second, any clause upon which the parties bargain to impasse will become a topic of interest arbitration. There the arbitration panel is instructed to be mindful of the statute's purpose to promote dedicated and uninterrupted public service through an effective and adequate means of settling disputes. RCW 41.56.465. This statute protects unions from the interest arbitration panel's rubber-stamping of employer proposals.

Finally, as to the Association's claim that *Borg-Warner* somehow altered or overruled *American National*, no court in the 38 years since *Borg-Warner* has come to such conclusion. *American National* is persuasive authority. That *Borg-Warner* presented a more refined methodology for distinguishing proper subjects for arbitration does not change any of the results of *American National*.

The ultimate issue then is whether the management rights proposal is a mandatory subject of arbitration which may be insisted upon to impasse. "It is the particular proposal, not merely the problem to which it is addressed, that must concern 'wages, hours, and other terms and conditions of employment.'" *N.L.R.B. v. Davison,* 318

F.2d 550, 557 (4th Cir. 1963). In the case before this court, practically every item listed in the clause addresses either wages, hours or working conditions, i.e., mandatory subjects of bargaining. Nor does the management rights proposal circumvent the right of the union to represent its members, as would, for example, a direct dealing clause like the one in *Toledo Blade.* The hearing examiner found, in a decision affirmed and adopted by PERC, the City did not act in bad faith in making the proposal. We agree and affirm the PERC decision that the clause was a mandatory subject of bargaining.

## ORAL AGREEMENT

Public employers and unions are obligated to negotiate in good faith. RCW 41.56.030(4). PERC found the Association's "sudden change of position could support an inference that the withdrawal of agreement" on the grievance procedure was intended to frustrate the collective bargaining process. RP at 425. However, PERC concluded the Association did not bargain in bad faith and commit an unfair labor practice because the parties had agreed in their "ground rules" for reaching a tentative agreement that such agreements would be in writing and signed by the parties. RP at 425.

The City asserts the factual findings of the hearing examiner, which found a tentative agreement existed, are supported by substantial evidence and that PERC erred in substituting its judgment for the judgment of the hearing examiner. The Association contends this dispute is a mixed question of law and fact: the legal question being what constitutes a bad faith refusal to bargain, the factual question being whether there was a tentative agreement reached by the parties. It asserts PERC did not commit an error of law in concluding that the Association did not engage in bad faith bargaining and that its finding there was no tentative agreement was supported by substantial evidence.

"The obligation to bargain in good faith encompas-

ses a duty to engage in full and frank discussions on disputed issues and to explore possible alternatives, if any, that may achieve a mutually satisfactory accommodation of the interest of both the employer and the employees." *Teamsters Union, Local 378*, X WPERR (PECB Dec. 3706-A (Sept. 26, 1991)). While both parties stress the question of whether a tentative agreement existed concerning the grievance procedure, "the dominant issue is not whether an agreement was reached, but whether the parties negotiated in good faith." *N.L.R.B. v. Industrial Wire Prods. Corp.*, 455 F.2d 673, 677 (9th Cir. 1972). *Industrial Wire* found an employer engaged in an unfair labor practice when acting in a manner similar to the Association's. The rules set a uniform standard for all parties. Thus, even if a tentative agreement had not been reached, this alone would not insulate the Association from a finding that it acted in bad faith. *Id.*

While the Association acted in a manner that could lend itself to a conclusion of bad faith, we are mindful that the parties here were engaged in labor negotiations. As such, they were adversaries and the law does not require them to reach an agreement. "The duty to bargain collectively does not generally include the obligation to agree to a proposal or make a concession." *International Ass'n of Fire Fighters*, 119 Wn.2d at 384. Parties in negotiations may therefore act in a manner that could be classified as intransigent and make sudden and unilateral changes in their position so long as they do not violate their duty to engage in full and frank discussions and explore possible alternatives that may result in an agreement. *See Mason County*, PECB Dec. 3706-A at 9 (1991). As PERC correctly observed, however, parties may only remain intransigent if their insistence is genuinely and sincerely held and does not constitute a rejection of the principles of collective bargaining. *See* CP at 36.

Whether a party has failed to negotiate in good faith, although involving a substantial factual component, is a mixed question of law and fact. *See Penntech Papers*,

*Inc. v. N.L.R.B.*, 706 F.2d 18, 23 (1st Cir.), *cert. denied*, 464 U.S. 892, 104 S. Ct. 237, 78 L. Ed. 2d 228 (1983). In this case, we believe PERC accurately concluded that the Association fulfilled its duty to negotiate in good faith. Because the parties agreed that any tentative agreements between the Association and the City would be in writing, it was not unreasonable for Cline to disavow the informal agreement his predecessor had made with Rubstello prior to memorialization. This conclusion does not hinge on the legitimacy of the oral agreement, but rather on Cline's intent in disavowing the agreement. Cline steadfastly refused to adopt an agreement made by his predecessor of which he, Cline, was previously unaware. Moreover, once Cline discovered the agreement's existence, he believed it to be illegal. His intransigence on this issue was therefore genuine and sincere. In addition, Cline disavowed the agreement at the first opportunity presented to him to do so, and he continued to correspond with the City after his disavowal in an effort to achieve a settlement under a different basis. Thus, there was substantial evidence within the record that the Association acted in good faith on this issue. See RCW 34.05.570(3)(e). As to the legal component, we recognize PERC's interpretation of collective bargaining statutes is "entitled to substantial weight and great deference." *International Ass'n of Fire Fighters*, 119 Wn.2d at 382. Given our deference to PERC's interpretation, we cannot say it erroneously interpreted or applied the law here.

Consequently, we affirm PERC's decision that the Association did not engage in an unfair labor practice.

## CONCLUSION

We hold that the management rights and hours of work proposals in this case were mandatory subjects of bargaining upon which the City was entitled to insist until impasse. We further hold that the Association did not commit an unfair labor practice when it disavowed its oral commitment to abide by existing grievance proce-

dures. We consequently affirm PERC's order in its entirety.

DURHAM, C.J., and DOLLIVER, SMITH, GUY, JOHNSON, MADSEN, and ALEXANDER, JJ., concur.

TALMADGE, J. (concurring) — I agree with the majority's disposition of the issues pertaining to the management rights clause and the alleged unfair labor practice, but I write separately to express some frustration with respect to the absence of a clear definition of permissive and mandatory bargaining for management rights clauses in public employee collective bargaining.

The majority is correct in deciding the management rights clause here addressed wages, hours and working conditions and, as such, was a mandatory subject of bargaining under RCW 41.56.030(4). I remain concerned, however, that the positions taken by the parties in this case, advanced to an extreme, could become problematic. Very generalized management rights clauses strip a union of its ability to represent its members and adequately address issues of wages, hours and conditions. I am not as sanguine as the majority that the obligation to negotiate in good faith will successfully address this problem. Majority op. at 466-67.

Conversely, accepting the argument by the Association here that management rights clauses must be narrowly construed and collective bargaining must follow on all matters that touch on wages, hours and working conditions (nearly all workplace controversies) would swallow up management rights.

This area is ripe for legislative involvement by defining, or authorizing the Public Employment Relations Commission to establish by rule the appropriate scope of management rights clauses for wages, hours and working condi-

472

tions as mandatory subjects of collective bargaining under RCW 41.56.030(4).

Reconsideration denied August 22, 1997.