# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| WA INTERPRETERS, a nonprofit corporation,<br><br>Appellant,<br><br>v.<br><br>WASHINGTON PUBLIC EMPLOYMENT RELATIONS COMMISSION, a Washington State agency, and WASHINGTON STATE DEPARTMENT OF LABOR AND INDUSTRIES,<br><br>Respondents. | No. 58071-3-II<br><br><br><br>PUBLISHED OPINION |

VELJACIC, A.C.J. — WA Interpreters, a bargaining representative pursuant to RCW 41.56.030(2), appeals the superior court's affirmation of a Public Employment Relations Commission (PERC) decision. The decision concluded that the Department of Labor and Industries' (L&I) implementation of the new Interpreting Works Scheduling System (IW or system), after WA Interpreters filed its representation petition, was permissible and preserved the dynamic status quo. WA Interpreters argues that the superior court erred in affirming PERC's decision because it (1) erroneously interpreted or applied the law, (2) was inconsistent with agency rules, (3) was not supported by substantial evidence, and (4) was arbitrary and capricious.

Because the superior court did not err in its analysis, as L&I clearly communicated the decision to change and implement the system before WA Interpreters filed their representative petition, we hold the superior court did not err in affirming PERC's decision. Accordingly, we affirm.

FACTS

I.    BACKGROUND

L&I purchases interpretation services for medical providers and vocational counselors. The services assist injured workers or crime victims with limited English proficiency. The most common interpretation used is in-person, but it can also occur telephonically or via videoconferencing. Those who provide interpretation are known as language access providers (LAPs). RCW 74.04.025(10)(a).

LAPs are independent contractors pursuant to RCW 41.56.510(1). However, they are paid by L&I and have collective bargaining rights under RCW 41.56.510. But those rights are limited to only a statutorily defined list of subjects: "(i) Economic compensation, such as the manner and rate of payments, including tiered payments; (ii) professional development and training; (iii) labor-management committees; (iv) grievance procedures; (v) health and welfare benefits; and (vi[]) other economic matters." RCW 41.56.510(2)(c).

Until 2021, LAPs would receive payment from L&I for in-person interpretation in various ways. One option was that LAPs could work through an interpretation agency, which booked their appointments and billed L&I. The agency then paid LAPs based on their agreed-upon rate. Another way was that LAPs could secure work as an "independent interpreter," which meant they got appointments via established relationships with providers, vocational counselors, and their fellow interpreters, and they billed L&I directly for their services using L&I's system.

II.    PASSAGE OF SECOND SUBSTITUTE SENATE BILL 6245 IN 2018

The legislature enacted Second Substitute Senate Bill (SSSB) 6245, 65th Leg., Reg. Sess. (Wash. 2018), codified as RCW 39.26.300, which became effective on June 7, 2018. The statute

required several agencies, including L&I, that purchase interpreter services on behalf of limited English-speaking individuals to:

> (3) [n]o later than September 1, 2020, the . . . department of labor and industries *must purchase in-person spoken language interpreter services directly from language access providers as defined in RCW 74.04.025, or through limited contracts with scheduling and coordinating delivery organizations, or both.  Each state agency must have at least one contract with an entity that provides interpreter services through telephonic and video remote technologies.*  Nothing in this section precludes the department of labor and industries from purchasing in-person spoken language interpreter services directly from language access providers or from directly reimbursing language access providers.
>
> (4) Notwithstanding subsection (3) of this section, the department of labor and industries may pay a language access provider directly for the costs of interpreter services when the services are necessary for use by a medical provider for emergency or urgent care, or where the medical provider determines that advanced notice is not feasible.

Former RCW 39.26.300 (2018) (emphasis added).

Following the statute's implementation, L&I decided it would be pursuing the dual option. The dual option meant that the majority of appointments, non-emergent, would go through IW for scheduling, but LAPs would still be able to bill L&I directly and be scheduled by providers for emergent appointments.

L&I had in place various methods to convey its decisions and announcements.  For example, before 2018 L&I created and communicated with stakeholders, including LAPs, via listserv, which the LAPs could request to join.  Following 2018, L&I implemented a notification system called GovDelivery.  L&I  also communicated with LAPs and stakeholders via its website.

Communication regarding the change required pursuant to SSSB 6245 was sent to stakeholders via its GovDelivery system on December 10, 2018.  The message also stated that a recommendation for implementation should be ready by the end of the first quarter in 2019.

On March 21, 2019, a message sent through the GovDelivery system noted that effectively, L&I was no longer allowed to purchase language interpretation services through a broker or agency, and in-person LAP services would go through the new system.

Three months later, another message stated that the changes to the interpreter system were to come by 2020.

III.     L&I IMPLEMENTATION

On July 24, 2019, L&I notified LAPS and stakeholders that it had decided to contract with one or more scheduling organizations and requested proposals.  The message reached 1,373 subscribers, including several of the testifying LAPs.  The message also stated that interpreter agency accounts would be deactivated as a result.

Two months later, L&I sent another message regarding the request for proposals posted in July 2019.

On July 22, 2020, L&I announced the new system would be coming "[t]his fall" after selecting IW as the winner of the proposals.  Admin. Rec. (AR) at 478, 578.  L&I signed the contract[1] with IW in July 2020.

In August 2020, stakeholders, which included LAPs, were invited to participate in a study of IW's registration process.  L&I also added a notation regarding the new system to the remittance advice (i.e. payment) sent to LAPs when their bills were adjudicated.

In September 2020, L&I published its annual Language Access Services payment policy, which became effective October 1, 2020.  The payment policy noted that the scheduling of

---

[1] Despite WA Interpreters' attempts to add the contract into the administrative record, it failed to properly supplement the record and the contract was not considered.  Likewise, we do not consider it here.

appointments would need to go through IW, except for emergent, urgent, and walk-in cases. The policy was published on the L&I website and sent via the GovDelivery system.

Between September 3 and 18, 2020, L&I sent five messages via its GovDelivery system informing LAPs and providers that L&I would begin hosting webinars and question-and-answer sessions with stakeholders regarding the new system. The webinars instructed LAPs and providers on how to register for the IW system and explained how to navigate the platform. Approximately 725 individuals attended the September webinars. However, L&I had yet to fully implement the IW scheduling system.

In October 2020, L&I sent another message via GovDelivery, reaching 2,451 subscribers. The message stated:

> Update: New Spoken Language Interpreter Scheduling System
>
> Launch Details Coming Soon
>
> As you are aware, the Department of Labor & Industries (L&I) is in the process of deploying a new online spoken language interpreter scheduling system. . . .
> L&I is currently finalizing the system's implementation timeline and onboarding new project team members to ensure a successful launch. . . .
> In the meantime, we highly encourage providers and interpreters to continue signing up for the new online scheduling system.

AR at 497.

IV. REPRESENTATION PETITION FILED BY WA INTERPRETERS

On November 23, 2020, WA Interpreters filed a representation petition with the PERC seeking certification as the exclusive bargaining representative of LAPs providing interpreter services for injured workers and crime victims receiving benefits from L&I.[2]

---

[2] Two days later, Washington Federation of State Employees (WFSE) filed a motion to intervene in the proceedings with PERC. However, WFSE is not a party to this appeal.

As a result of failing to meet the September 2020 statutory deadline for implementation of the new system, L&I was required to submit a report to the legislature by December 2020. In the report, L&I noted that to comply with the statutory requirements under RCW 39.26.300, "[it] is working with a vendor to establish an interpreter scheduling system through which medical and vocational providers will schedule appointments with interpreters for all planned, non-emergent care." AR at 503.

The report informed the legislature of the progress of the system. Specifically, the report noted that L&I could not meet the September 2020 deadline due to "significant barriers," which included staffing changes on the team, resource diversion related to COVID-19, and the "need to resolve protests" regarding awarding the contract to IW. AR at 503. However, L&I highlighted that when the change was to occur, its stakeholders would be notified via the GovDelivery system at least 30 days prior to the effective date of any changes. Additionally, L&I noted that delayed implementation was to "re-evaluate the implementation timeline" to ensure the system met customer needs. AR at 503. Nevertheless, L&I highlighted that it was currently reviewing options for a revised implementation plan and planned to go live with the new system by spring 2021. Therefore, L&I asserted, no legislative intervention was necessary, nor did the delay impact any bargaining rights for LAPs. Lastly, L&I acknowledged that it was aware of two organizations submitting representation petitions to PERC, but none had yet to be certified.

In regards to the progress made, L&I stated it had: (1) met with stakeholders in order to understand their concerns and needs as they relate to the system, (2) selected a vendor, (3) enrolled up to 40 percent of LAPs into the new IW system as of November 2020, (4) conducted usability testing and was currently making adjustments, (5) created and adopted a new payment policy outlining that all appointments for interpretation would be done through the IW system except for

emergent appointments, (6) in conjunction with IW, developed educational material and conducted training for providers and LAPs on how to enroll and use the new system, and (7) created a YouTube video explaining registration and usage of the system to those who were unable to attend.

In 2021, L&I continued to send messages via its GovDelivery system. First, in January, L&I sent a statement that implementation of the new system was delayed due to some challenges noted in its report to the legislature, but it was currently reassessing the implementation timeline. The message also stated that L&I expected to announce a go-live date of the new system sometime in the spring with at least a 30-day notice. The message reached 6,451 recipients.

On March 12, 2021, L&I announced the launch date for the new system—April 12, 2021. The message reached 2,671 recipients, encouraged LAPs and providers to register, and notified providers that they would need to use the new system when scheduling appointments because interpreters would only be paid if they used the new system.

On March 25, L&I sent another message reminding all that the new system would go live on April 12. That message reached 2,698 recipients. A last reminder was sent on April 9, 2021. The system went live on April 12, 2021.

V.      UNFAIR LABOR PRACTICE CLAIM

        A.      Hearing Examiner

WA Interpreters filed an unfair labor practice complaint on March 30, 2021, while the representation petition was pending, alleging L&I unlawfully changed the manner in which LAPs schedule appointments and were paid by L&I.[3]  After an Unfair Labor Practice Administrator

---

[3] WA Interpreters amended its complaint on April 13, 2021, withdrawing its allegation of employer interference.

issued a preliminary ruling regarding the causes of action, a hearing was set for September 13 and 14, 2021, before a hearing examiner (Examiner).

At the hearing, L&I argued that the implementation of the IW scheduling system was part of the dynamic status quo. In response, WA Interpreters argued that the implementation was not part of the dynamic status quo and presented testimony from 11 LAPs. However, when questioned by the WFSE, more than half of the LAPs testified to knowing that L&I was implementing the system via meetings with L&I and the GovDelivery system as far back as 2018. For example:

> [WSFE] And were you aware of any kind of publications that L&I put out after 20—or during 2018, 2019 regarding the new system?
> [LAP 1] . . . I did—you know, I did read when they say, you know, a new system is coming. . . .
> [LAP 1] Yes, I'm signed up with the email [GovDelivery]
> . . . .
> [LAP 1] I did attend one of the webinars with [IW]
> . . . .
> [Provider/Stakeholder] we get notifications through the L&I [GovDelivery] system
> . . . .
> [WSFE] When did you first become aware that L&I was planning on changing the scheduling system?
> [LAP 2] I was notified probably three years ago that they were planning to switch the system . . . [t]here would be a new system implemented or to be dual system . . . about three years ago . . . since three years ago, which is about 2018, probably s[aw] about dozen, half a dozen about the new implementation . . . 2018 to 2021.
> . . . .
> [WSFE] But you knew that new online scheduling system was kind of in the works, was planned for about the last year and a half or two years?
> [LAP 3] Yes, I knew a new system was going to come up . . . [t]here are emails sent to interpreters regarding any changes, anything new about L&I. . .
> [WSFE] [D]id you first start getting those emails a year and a half or two years ago?
> [LAP 3] That would be about the time.
> [WSFE] Did you—did you consult the L&I website that had some postings on the new online system?
> [LAP 3] Yes, I did. . . could have been over a year ago.
> [WSFE] . . . [D] id you receive any of the emails from L&I when—that they were sending out to interpreters about the implementation of the scheduling program?

[LAP 4] I did receive some emails, yes, talking about they were reviewing options. So the emails that I received range from 2018 to pretty much right before the implementation

[WSFE] . . . [D]id you attend or view any of the L&I webinars on the scheduling program?

[LAP 4] Yes, I did.

[L&I] . . . I take it from your testimony and some of the exhibits that you were signed up through L&I on their listserv to receive those emails about—with updates; is that correct?

[LAP 4] Yes. That's correct.

[L&I] And those came pretty much throughout the years in which this was being developed; would you agree?

[LAP 4] Yes. Since 2018, I believe. Yes.

[LAP 4] . . . What I do recall from these emails is that they failed to implement it on September 1, 2020, so they kept on giving possible, you know, range of dates. And nothing was complete until we had a notice . . . days before the implementation . . . on March 12th.

AR at 173-75, 183, 192, 193, 194, 247, 248, 249, 305, 306, 310, 313.

LAPs also testified that the new system makes them uncomfortable due to its tracking system, it had affected the number of appointments they have, it led to a delay in payment, it is a more time-consuming and laborious process, it makes it difficult to check in for appointments, it double books interpreters, it scheduled appointments far from their home locations, it made it so interpreters can no longer contact patients directly resulting in last minute cancellations, and it is stressful.

Ultimately, the Examiner concluded:

L&I and IW . . . took numerous steps to roll out the system during the late summer and fall 2020. LAPs were notified of these developments prior to the filing of the representation petition. The decision to implement the new scheduling system thus became part of the dynamic status quo. It was expected by the employees, and its rollout in April 2021 did not interfere with the LAPs' collective bargaining rights.

AR at 85. On November 23, 2021, the Examiner entered the relevant following findings of fact and conclusions of law:

4. LAPs provide services throughout the state and are a highly dispersed workforce. L&I communicates with them in a range of ways. It routinely posts

9

updates for interpreters on its website. It also utilizes email. L&I maintains various email listservs to convey information to stakeholders. One listserv is for individuals interested in updates applicable to LAPs. LAPs are not automatically subscribed to the listserv, but instead must affirmatively sign up on their own. At all times relevant to the instant unfair labor practice complaints, L&I's LAP listserv had between 1,000 and 2,500 recipients, many of whom were LAPs. L&I also has the ability to send notifications to independent interpreters when they are paid by L&I for services performed. When doing so, L&I includes a note in its remittance form with the appropriate message.

5. In March 2018, the legislature passed, and the governor signed, Second Substitute Senate Bill 6245 (SSSB 6245). One of the bill's goals was to centralize and consolidate the procurement of spoken language interpreter services. In order to do so, it established new contracting requirements for L&I. These requirements were codified into RCW 39.26.300. The bill became effective June 7, 2018. L&I interpreted the legislation to require it to review the manner in which it procured interpretation services.

6. . . . [I]n 2019 the [L&I] decided to contract with a scheduling organization that would book most LAP appointments. . . . The decision to contract with a scheduling organization and issue an [request for proposals] to purchase a system was communicated publicly. A message describing L&I's decision to contract with a scheduling organization was sent to the LAP listserv on March 21, 2019. The RFP was subsequently issued on July 23, 2019. L&I sent out an announcement of this development the next day. The message was sent to approximately 1,400 recipients.

7. Following the procurement process, L&I selected the vendor . . . (IW) to provide the scheduling services described in SSSB 6245. L&I then negotiated and signed a contract with IW at some point during the first half of 2020. L&I's decision was announced to interpreters via email to the LAP listserv on July 22, 2020. It was sent to approximately 1,400 recipients.

8. SSSB 6245 required L&I to effectuate its chosen new scheduling method by September 1, 2020. L&I took a number of actions in an attempt to comply with the statutory deadline. First, on September 1, 2020, it published a new payment policy for LAPs. The policy provided, "As of September 2020, L&I has a contract with [IW] for the scheduling of most interpreter appointments. Providers should use this scheduling portal for their interpreter needs, except for some on-demand appointments." Notification of the new policy was sent out to around 2,300 recipients on the LAP listserv on September 1, 2020. IW also opened registration for the LAPs. In order to assist LAPs in the transition to using IW, L&I conducted webinars for interpreters on September 16 and 25, 2020. The webinars were designed to instruct users on how to navigate and use the system. Notification of the webinars, as well as a separate question-and-answer session on September 23, 2020, was communicated via the LAP listserv. A combined total of approximately 725 LAPs, medical providers, and vocational counselors attended the webinars offered by L&I. Following L&I's outreach, by November 22, 2020, approximately 40 percent of the LAPs who provided services in 2019 had registered in the IW system.

10

9. Unfortunately, L&I was unable to meet the legislature's deadline for the implementation of the new scheduling system. Technical issues, combined with the impact of the COVID-19 pandemic and staff turnover, pushed out the date for the system's transition. L&I communicated this delay to interpreters via an email sent to the LAP listserv on October 30, 2020. The message went to around 2,450 recipients.

10. As L&I continued to work through the various technical and personnel issues delaying implementation of the IW system, WA Interpreters filed its representation petition on November 23, 2020.

11. Despite the filing of the petition, L&I moved forward with its rollout of the IW system. During the first several months of 2021 it continued to provide updates and guidance to the LAPs. On March 12, 2021, L&I sent an email to the LAP listserv announcing April 12, 2021, as the new implementation date. Beginning April 12, 2021, LAPs have had to utilize the IW scheduling system in order to book most appointments.

CONCLUSIONS OF LAW

1. The Public Employment Relations Commission has jurisdiction in this matter pursuant to chapter 41.56 and chapter 391-45 WAC.

2. By its actions described in findings of fact 3–11, the employer did not interfere with employee rights in violation of RCW 41.56.140(1) by changing the way LAPs schedule appointments during the pendency of a representation petition.

AR at 85-88. The Examiner dismissed WA Interpreters's unfair labor practices (ULP) complaint.

B.     PERC Appeal and Decision

On December 13, 2021, WA Interpreters timely appealed the Examiner's dismissal of its ULP claim to PERC. WA Interpreters argued that the dynamic status quo obligation applies only to mandatory subjects of bargaining, the Examiner should have determined whether the assignment of LAPs' appointments is a mandatory subject of bargaining before proceeding to the dynamic status quo analysis; and that L&I's implementation of the IW system was not justified as part of the dynamic status quo in part because it failed to announce an implementation date for the IW system until five months after WA Interpreters had filed its representation petition.

Two months later, PERC affirmed the Examiner's dismissal of WA Interpreters's ULP claim against L&I. PERC adopted the Examiner's findings of fact and conclusions of law, noting:

> Substantial evidence supports the Examiner's findings of fact, which in turn support the conclusions of law. The decision to change the scheduling system was made before the union filed the representation petition. The employees expected the change. Implementation of the new scheduling system was part of the dynamic status quo. Thus, the employer did not violate RCW 41.56.140(1) when the employer implemented the new scheduling system while the representation petition was pending before the agency.

AR at 17.

### C. Appeal to Thurston County Superior Court

On March 25, 2022, WA Interpreters filed a petition for review pursuant to the Administrative Procedure Act (APA), chapter 34.05 RCW, with the Thurston County Superior Court. WA Interpreters argued that PERC erred in determining that (1) L&I's implementation of the system, while its representation petition was pending, was permitted under the dynamic status quo doctrine; (2) that SSSB 6245 did not require L&I to alter LAP working conditions; (3) the Examiner relied on the contract between L&I and IW, which was not in the record; (4) that LAPs did not expect implementation of the IW system; (5) L&I was required to have scheduled implementation of the system before the petition was filed for the doctrine to apply; and (6) that the PERC order did not address all issues requiring resolution as the scheduling of LAP appointments is a mandatory subject of bargaining under RCW 41.56.510(2)(c). WA Interpreters attached to its petition exhibit 41—a copy of the contract between L&I and its software vendor.

L&I responded, arguing that PERC correctly determined that implementing the IW system was part of the dynamic status quo. Specifically, because (1) SSSB 6245 required L&I to change how it purchased in-person LAP services, (2) as a result, L&I took steps to initiate the new system before the petition was filed, (3) changes to the system were communicated and expected by LAPs before filing of the petition, (4) the delay in implementation did not negate the dynamic status quo,

and (5) PERC decided all the issues as whether the system was or was not a mandatory subject of bargaining was not in controversy.

The superior court heard arguments on March 10, 2023. Thirteen days later, the court issued an ex parte order. Notably, the court stated it did not consider exhibit 41 attached to WA Interpreters's opening brief because "such was not part of the record considered by the Examiner and that this Court may only consider evidence in the administrative record per RCW 34.05.558." Clerk's Papers (CP) at 130. Ultimately, the court affirmed PERC's decision and dismissed WA Interpreters's ULP claim. WA Interpreters appeals.

## ANALYSIS

I.      STANDARD OF REVIEW

A.      Administrative Procedure Act (APA)

We review a PERC decision in an unfair labor practice case according to APA standards. *Pasco Police Officers' Ass'n v. City of Pasco*, 132 Wn.2d 450, 458, 938 P.2d 827 (1997). As we conduct our review, we sit in the same position as the superior court, applying the RCW 34.05.570 standard directly to the agency record. *Postema v. Pollution Control Hr'gs Bd.*, 142 Wn.2d 68, 77, 11 P.3d 726 (2000).

An appellant is entitled to relief if, among other reasons, (1) the agency has erroneously interpreted or applied the law; (2) the agency's decision is inconsistent with agency rules; (3) the agency's findings are not supported by substantial evidence, or (4) the agency order is arbitrary and capricious. RCW 34.05.570(3)(d), (h), (e), (i); *Lincoln County v. Pub. Emp. Rels. Comm'n*, 15 Wn. App. 2d 143, 151, 475 P.3d 252 (2020) ("Under the APA, we may grant relief from an agency order for any one of nine reasons set forth in RCW 34.05.570(3).").

13

Because PERC is entitled to substitute its findings for those of the hearing examiner, it is PERC's findings that are relevant on appeal. *Yakima Police Patrolmen's Ass'n v. City of Yakima*, 153 Wn. App. 541, 552, 222 P.3d 1217 (2009). We review challenges to PERC's factual findings for substantial evidence in light of the whole record, i.e., evidence sufficient to persuade a fair-minded person of the truth. *Id.* at 552-53. Notably, unchallenged findings of fact are verities on appeal. *Hopkins v. Dept' of Lab. & Indus.*, 11 Wn. App. 2d 349, 353, 453 P.3d 755 (2019).

We review PERC's conclusions of law de novo and may substitute our interpretation of the law for PERC's interpretation. *Pasco Police Officers' Ass'n,* 132 Wn.2d at 458. However, we extend great deference to PERC's interpretation of the laws it administers. *Pub. Emp't Rel. Comm'n v. City of Kennewick*, 99 Wn.2d 832, 841-42, 664 P.2d 1240 (1983).

Finally, an agency order is arbitrary and capricious if it is unreasonable and ignores facts and circumstances in the record. *Port of Seattle v. Pollution Control Hr'gs Bd.*, 151 Wn.2d 568, 589, 90 P.3d 659 (2004). However, "[w]here there is room for two opinions, and the agency acted honestly and upon due consideration, this court should not find that an action was arbitrary and capricious, even though this court may have reached the opposite conclusion." *Port of Seattle*, 151 Wn.2d at 589.

B.    UNFAIR LABOR PRACTICE CLAIMS

The public employees' collective bargaining act, chapter 41.56 RCW, requires employers to bargain collectively with unions representing their employees. It allows employees to organize and choose a representative (union) for purposes of collective bargaining free from interference. RCW 41.56.040, .140(1). However, prior to certification by the commission, unrepresented employees who are the subject of a representation petition do not have a collective bargaining representative. *Wash. Fed'n of State Emps. v. State – Att'y Gen.*, No. 21156-U-07-5399, at 2

(Wash. Pub. Emp't Rels. Comm'n Dec. 2, 2011), https://decisions.perc.wa.gov/waperc/decisions/en/179111/1/document.do.

Long-standing PERC precedent and rules require an employer to maintain the status quo with respect to the wages, hours, and other terms and conditions of employment for employees affected by a representation petition while the petition is pending before the agency. *In re Klickitat County Sheriff's Supervisors Ass'n*, No. 11744-E-95-1928, at 14 (Wash. Pub. Emp't Rels. Comm'n Mar. 13, 1996), https://decisions.perc.wa.gov/waperc/decisions/en/176268/1/document.do; WAC 391-25-140(2). The relevant status quo is determined as of the date of the filing of the petition. *Teamsters Union, Loc. 763 v. Val Vue Sewer Dist.*, No. 18583-U-04-4728, at 5 (Wash. Pub. Emp't Rels. Comm'n June 16, 2005), https://decisions.perc.wa.gov/waperc/decisions/en/172397/1/document.do. Changes to wages, hours, and working conditions during the pendency of a representation petition may improperly affect the laboratory conditions necessary to the free exercise by employees of their right to vote. *Clark County Custody Officers Guild v. Clark County*, No. 11440-U-94-2684, at 7 (Wash. Pub. Emp't Rels. Comm'n Nov. 30, 1995), https://decisions.perc.wa.gov/waperc/decisions/en/178460/1/document.do, *aff'd*, No. 11440-U-94-2684 (Pub. Emp't Rels. Comm'n Apr. 16, 1996). "The obligation to maintain the status quo is premised on preventing employer interference in the election process in violation of RCW 41.56.140(1)." *Teamsters Loc. 760 v. Ben Franklin Transit*, No. 132878-U-20, at 9 (Wash. Pub. Emp't Rels. Comm'n Oct. 20, 2020), https://decisions.perc.wa.gov/waperc/decisions/en/487545/1/document.do.

A party alleging interference by a change to the status quo meets its burden of proof by establishing the employer unlawfully altered the status quo. *Wash. Fed'n of State Emps.*, No.

21156-U-07-5399, at 5. The challenging party need not establish that a typical employee could reasonably perceive the employer's actions as a threat of reprisal or force, or promise of benefit associated with the employee's union activity. *Id.* And a showing of intent or motivation is not required to find an interference violation. *Wash. Fed'n of State Emps. v. State – Att'y Gen.*, No. 21156-U-07-5399, at 3 (Wash. Pub. Emp't Rels. Comm'n Apr. 16, 2010), https://decisions.perc.wa.gov/waperc/decisions/en/178678/1/document.do.

    D.       DYNAMIC STATUS QUO

        1.      Legal Principles

A complainant has the burden of proof to show, by a preponderance of the evidence, that the employer has committed the complained-of unfair labor practice. WAC 391-45-270(1)(a). An employer is responsible for the presentation of its defense, but only has the burden of proof as to any affirmative defenses. WAC 391-45-270(1)(b). The dynamic status quo doctrine is an affirmative defense. *Int'l Longshore & Warehouse Union, Loc. 25 v. Port of Anacortes*, No. 26395-U-14-6737, at 8 (Wash. Pub. Emp't Rels. Comm'n Dec. 24, 2014), https://decisions.perc.wa.gov/waperc/decisions/en/179006/1/document.do.

PERC precedent acknowledges the affirmative defense of dynamic status quo and recognizes "that occasionally the status quo is not static and the employer needs to take action to follow through with changes that were set in motion prior to the union filing a representation petition." *Int'l Bhd. Of Elec. Workers, Loc. 77 v. City of Seattle*, No. 20776-U-06-5289, at 3 (Wash. Pub. Emp't Rels. Comm'n Feb. 19, 2009), https://decisions.perc.wa.gov/waperc/decisions/en/172028/1/document.do.

When determining if an employer's action is under the umbrella of the dynamic status quo doctrine, we look to "the extent to which the employer communicated its decision to employees

prior to the filing of the petition." *Ben Franklin Transit*, No. 132878-U-20, at 9. However, the change must be "clearly communicated." *Id.* Failure to do so by the employer results in violation of the status quo as "the employer cannot . . . rely on the workplace rumor mill to establish the exitance of a dynamic status quo." *Id.* at 10.

In other words, "'[w]hat sets the dynamic status quo in motion is the employer's decision to which it is bound and at which point it no longer has discretion, and therefore, its action or inaction is expected by the employees.'" *Id.* at 10-11 (quoting *Pub. Sch. Emps. of Wash. v. Cent. Wash. Univ.*, No. 10967-A-PERC, at 8 (Wash. Pub. Emp't Rels. Comm'n Aug. 3, 2012, https://decisions.perc.wa.gov/waperc/decisions/en/179129/1/document.do)). If it is determined that the dynamic status quo was violated, the employer must restore the status quo and make employees whole. *Id.*

The dynamic status quo recognizes that, occasionally, circumstances exist where changes determined and set in motion by the employer prior to the filing of a representation petition do not disrupt a bargaining relationship or undermine support for a union because the petitioned-for employees expect the changes to occur. *Wash. Council of County & City Emps. v. Adams County*, No. 16336-U-02-4180, at 9 (Pub. Emp't Rel. Comm'n Jan. 24, 2003), https://decisions.perc.wa.gov/waperc/decisions/en/172291/1/document.do; *Tech. Emps.' Ass'n v. King County*, No. 12192-U-95-2879, at 3 (Wash. Pub. Emp't Rels. Comm'n Apr. 21, 1998), https://decisions.perc.wa.gov/waperc/decisions/en/171481/1/document.do. Conversely, if changes the employees may view as negative merely carry out a dynamic status quo, no violation will be found. *Tech. Emps'* Ass'n, No. 12192-U-95-2879, at 7.

> 2.      PERC Did Not Erroneously Interpret or Apply the Law, Nor Was Its Ruling Inconsistent with Agency Rules

WA Interpreters argues that implementation of the IW system by L&I did not meet the dynamic status quo doctrine. Specifically, LAPs did not expect implementation of the new scheduling system because L&I had not yet scheduled the implementation of the new system at the time WA Interpreters filed the representation petition.[4]

L&I responds, arguing that the change in the scheduling system used for LAP appointments was required by the legislature as early as 2018. Consequently, L&I took steps to initiate the new scheduling system before WA Interpreters filed its representation petition in 2020. L&I also argues that since 2018, it has communicated the changes to LAPs via various methods of communication, and thus, the new scheduling system was expected. Lastly, it argues that the delay in the implementation of the system did not negate the dynamic status quo as it continued to communicate with LAPs throughout that time. We agree with L&I.

Here, the record shows that L&I decided to contract with IW to implement a new scheduling system as a result of RCW 39.26.300. This decision was clearly communicated to stakeholders, including LAPs, numerous times since 2018. A total of 14 messages were sent out alerting stakeholders of the new IW system before the representation petition was filed.

---

[4] WA Interpreters also argues that the system was a mandatory subject of bargaining relying on *Adams County*, and that the Examiner relied on the contract between L&I and Language Link (vendor for IW system), which was evidence not in the record relieving L&I of its burden. However, both the commission and the superior court did not consider the contract as it was not a part of the administrative record. Notably, WA Interpreters attempted to make it part of the record with the commission and superior court by attaching it as Exhibit 41 to their opening briefs, but both found that WA Interpreters had not properly supplemented the record and neither considered it in their decisions. As for the system being a mandatory subject of bargaining, that was not at issue, nor was it addressed by the Examiner, PERC, or the superior court as they all concluded that implementation of the system was part of the dynamic status quo. We do not consider arguments raised for the first time on appeal. RAP 2.5(a).

Additionally, LAP testimony notes that they knew the change was coming via L&I's various methods of communication—website and GovDelivery messages—since as far back as 2018, even if L&I did not have an exact implementation date. The fact that the new scheduling system is seen as a negative or has caused LAPs some frustration is insufficient to prove implementation of the system was not part of the dynamic status quo. If "changes the employees may view as negative merely carry out a 'dynamic status quo' . . . no violation will be found." *Tech. Emps' Ass'n*, No. 12192-U-95-2879, at 7.

Further, L&I not only sent messages notifying stakeholders, including LAPs, of the incoming new scheduling system with IW, it also hosted several webinars and a question-and-answer session regarding the operation of the new system. Hundreds of individuals attended, and those who did not could still become informed via the YouTube video L&I created.

Although it cannot be said that every LAP received each and every one of these messages, L&I's efforts to disperse the information were abundant. L&I's efforts were sufficient to satisfy the "clearly communicated" necessity under the dynamic status quo doctrine. *Ben Franklin Transit*, No. 132878-U-20, at 9.

LAPs were aware that L&I was going to implement a new scheduling system. Whether it was by September 2020 as originally required by RCW 39.26.300 or April 2021, is not determinative as to whether implementation of the new scheduling system was part of the dynamic status quo because the status quo "is determined as of the date of the filing of the union's Petition for Investigation of a Question Concerning Representation." *Wash. Council of County & City Emps. v. King County Library Sys.*, No. 17557-U-03-4541, at 3 (Wash. Pub. Emp't Rels. Comm'n July 27, 2005), https://decisions.perc.wa.gov/waperc/decisions/en/172395/1/document.do. The dynamic status quo "may exist where actions are taken to follow through with changes that were

set in motion prior to the filing of a representation petition." *Id.* at 5; *Emergency Dispatch Ctr. Emps.' Guild v. Emergency Dispatch Ctr.*, No. 8071-U-89-1748, at 16 (Wash. Pub. Emp't Rels. Comm'n June 27, 1990), https://decisions.perc.wa.gov/waperc/decisions/en/178283/1/document.do ("Changes of conditions announced prior to the filing of the representation petition . . . are part of the 'dynamic status quo.'"). The decision to implement a new scheduling system was plainly made prior to WA Interpreters filing a representation petition; indeed, it was statutorily required. Accordingly, we conclude that the superior court did not misinterpret or misapply the law.

Additionally, while WA Interpreters alleges a violation of the agency rules, it fails to explicitly note which rule L&I violated. And even if L&I had allegedly violated an agency rule when implementing the system in April 2021, we cannot ignore the fact that L&I was under the explicit directive of the legislature to implement such a system since 2018 and the passage of SSSB 6245 (RCW 39.26.300).

3. PERC's Determination Was Not Arbitrary or Capricious Because It Was Reasonable, Did Not Ignore Facts and Circumstances in the Record, Nor Was There Room for Two Opinions.

WA Interpreters argues that PERC's order is unsupported by substantial evidence when viewing the record in its entirety, rendering it arbitrary or capricious.

L&I responds, arguing that substantial evidence supports PERC's order because LAPs expected the change following clear communications from L&I. We agree with L&I.

As previously stated, when viewing the record in its entirety, there is ample evidence that L&I clearly communicated the change to the new scheduling system well before WA Interpreters filed its representation petition in November 2020. We need not recount it here. Accordingly, we conclude that PERC's order is not arbitrary or capricious.

## CONCLUSION

Because the superior court did not err in its analysis, as L&I clearly communicated the decision to change and implement the system before WA Interpreters filed their representative petition, we hold the superior court did not err in affirming PERC's decision. Accordingly, we affirm.

Veljacic, A.C.J.

We concur:

Lee, J.

Lawler, J.P.T.[5]

---

[5] Judge Lawler is serving as a judge pro tempore of the court pursuant to RCW 2.06.150.